J. A21024/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JOIE DIGIOVANNI | : | IN THE SUPERIOR COURT OF |
| Appellant | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| JOHN B. MURPHY | : | |
| | : | |
| | : | No. 2902 EDA 2015 |

Appeal from the Judgment Entered September 15, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): November Term, 2013 No. 01291

BEFORE: Bender, P.J.E., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                    **FILED SEPTEMBER 22, 2016**

Appellant, Joie DiGiovanni, plaintiff below, appeals from the Judgment entered in the Philadelphia County Court of Common Pleas on September 15, 2015, in favor of Appellee, John B. Murphy, defendant below, following a jury trial. After careful review, we affirm.

We summarize the facts, as gleaned from the detailed trial court opinion, as follows. On February 5, 2012, Appellant was the passenger in a car, which was rear-ended. Appellee was the driver of the striking vehicle, and was travelling at approximately 45 miles per hour. Appellant did not wait for an ambulance to take her to the hospital following the accident, but rather travelled there in her boyfriend's car.

Appellant presented at the hospital with a scrape on her chin and a cut lip, and complaining of pain in her ankles, wrist, leg, hip, neck, and back.

Hospital staff performed x-rays and a C-T scan, both of which came back negative.  Appellant subsequently experienced swelling and bruising.

Appellant sought treatment for her injuries from five different medical professionals.   Ultimately, she received a diagnosis of fibromyalgia and rheumatoid arthritis.   Her doctor prescribed Appellant the drug Humira, which Appellant described as a "miracle drug."  **See** Trial Ct. Op., 2/25/16, at 1-3 (citations omitted).

On November 14, 2013, Appellant filed an arbitration Complaint against Appellee raising claims arising from injuries she alleged she sustained in the February 4, 2012 collision.  Specifically, Appellant claimed that, at the time of the accident she suffered from asymptomatic fibromyalgia and rheumatoid arthritis, which conditions were made symptomatic by the trauma of the accident.  Appellee filed an Answer with New Matter on October 20, 2014.  That same day, the arbitration panel entered an award for Appellant in the amount of $41,500.

Appellee filed an appeal from the Arbitration Award on October 30, 2014.  A three-day jury trial commenced on August 10, 2015.  Following the trial, the jury concluded that Appellee's negligence was not a factual cause of Appellant's injuries, and, thus, returned a verdict for Appellee on August 12, 2015.

Appellant filed a Post-Trial Motion on August 21, 2015, in which she alleged the jury's verdict was against the weight of the evidence and that

J. A21024/16

the court erred in permitting the jury to receive medical expert reports and internet articles produced by Appellee's counsel in cross-examination of Appellant's expert witness. On August 25, 2015, Appellee filed an Answer to Appellant's Post-Trial Motion. Appellant filed a "Reply in Support to Post-Trial Motion" on September 1, 2015.

Appellant filed a Notice of Appeal from the jury's August 12, 2015 verdict in favor of Appellee on September 4, 2015.[1] The trial court denied Appellant's Post-Trial Motion on September 14, 2015, and simultaneously entered Judgment in Appellee's favor.[2] Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

> 1. Whether the jury's finding that [Appellee's] negligence was not a factual cause of the injuries sustained by [Appellant] was against the weight of the evidence requiring the court to remand for a new trial.
>
> 2. Whether the court erred in sending portions of hearsay internet articles, which directly addressed the medical

---

[1] We note that Appellant's September 4, 2015 Notice of Appeal was premature as a final order had not yet been entered in the case. *See PA Energy Vision, LLC v. South Avis Realty, Inc.*, 120 A.3d 1008, 1012 n.3 (Pa. Super. 2015) (an appeal of a final order in a civil case lies from the entry of judgment). However, the trial court entered judgment following denial of Appellant's Post-Trial Motion on September 14, 2015, thus perfecting Appellant's appeal. *See Prime Medica Assocs. V. Valley Forge Ins.*, 970 A.2d 1149, 1154 n.6 (Pa. Super. 2009) (a final judgment entered during the pendency of an appeal is sufficient to perfect appellate jurisdiction).

[2] The court mailed the parties Pa.R.C.P. 236 Notice of Entry of Judgment on September 15, 2015.

causation issues and therefore likely [a]ffected the outcome of the case, into the jury room requiring the court to remand for a new trial.

Appellant's Brief at 6.

In her first issue, Appellant claims that the jury's conclusion that Appellee's negligence was not a factual cause of the harm Appellant suffered was against the weight of the evidence where neither Appellee's negligence, nor the fact that Appellant now suffers from fibromyalgia and rheumatoid arthritis, are in dispute. *Id.* at 21, 24. Appellant avers, that "[i]n light of the high speed collision together with the objective and undisputed evidence of injury, the verdict was against the weight of the evidence and justice requires a new [t]rial." *Id.* at 24.

When considering challenges to the weight of the evidence, we note that, "[t]he weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none or some of the evidence and to determine the credibility of witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015). "A jury is entitled to believe all, part or none or the evidence presented…. A jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve." *Martin v. Evans*, 711 A.2d 458, 463 (Pa. 1998) (citation and quotation omitted). Where a jury has made credibility determinations regarding the testimony and evidence presented, those determinations are rarely overturned. *Armbruster v. Horowitz*, 744 A.2d 285, 287 (Pa.

Super. 1999). Further, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Talbert**, **supra** at 546 (internal quotation marks and citation omitted).

The trial court cogently and comprehensively addressed Appellant's weight of the evidence claim in its Rule 1925(a) Opinion. Accordingly, with respect to this issue, we affirm on the basis of the trial court's well-reasoned Opinion. **See** Trial Ct. Op. at 5-7.

In her second issue on appeal, Appellant claims the trial court erred in permitting limited portions of internet articles from the Mayo Clinic, the National Institute of Health ("NIH"), and the Cleveland Clinic about rheumatoid arthritis into the jury room. Appellant's Brief at 24. Appellant claims that it was inappropriate to provide the jury with these documents because counsel had not moved them into evidence and they are hearsay documents.[3] **Id**.

At trial, both parties' expert witnesses testified at trial by way of videotaped deposition. The transcripts of those depositions, and the internet

---

[3] To the extent that Appellant challenges the trial court's decision to permit the jury to view the articles during deliberation on hearsay grounds, we find this argument waived. Our review of the record, including the deposition transcripts of Dr. Whalen and Dr. Derk, and the trial transcript, indicates that Appellant did not preserve this issue by making a specific, timely objection before the trial court. **See Boykin v. Brown**, 866 A.2d 1264, 1267 (Pa. Super. 2006) (holding that in order to preserve the application of a hearsay objection for appellate review, that specific exception must first be raised before the trial court).

J. A21024/16

articles used by counsel to question the witnesses attached thereto, were entered into evidence.

During deliberation, the jury asked the court to send back to the deliberation room the articles used by Appellee's counsel during cross-examination of Appellant's expert, Dr. Whalen. Following colloquy with counsel, and over Appellant's objection that the documents had not been moved into evidence, the trial court permitted the jury to receive "only the relevant pages [of the internet articles] that were touched upon from the testimony by the two experts[, Drs. Whelan and Derk]."[4] N.T., 8/12/15, at 68.

Notwithstanding Appellant's claim on appeal that the articles were not moved into evidence, our review of the record confirms that, "the articles were attached to Dr. Whalen's deposition transcript, Exhibit P-13, and were admitted into evidence [Exhibits D-5, D-7, and D-8]." Trial Ct. Op. at 8.

Moreover, Appellant represented to the court during an *in camera* discussion that the articles used by Appellee's counsel to cross-examine Dr. Whalen were "part of the transcript[,]" and "part of what we introduced as Dr. Whalen's testimony. We have the whole transcript and the tape introduced. And, in fact, [the NIH article] is Exhibit D-5 of [Appellant's] Exhibit, I think it's 13." N.T., 8/11/15, at 75-76. Appellant's counsel

---

[4] Pages 1, 3, 4, and 9-11 of the National Institutes of Health article, pages 1, 2, and 7 of the Mayo Clinic article, and page 1 of the Cleveland Clinic Article.

conceded that he "moved [into evidence] the entire transcript and this was attached to the transcript." *Id.* at 76.

During a jury trial, the court "may make exhibits available to the jury during its deliberations." Pa.R.C.P. 223.1(d)(3). The trial court has discretion to determine which exhibits should be permitted to be viewed by the jury during deliberations. ***Wagner by Wagner v. York Hosp.***, 608 A.2d 496, 503 (Pa. Super. 1992) (noting that "the trial court has the discretion to determine which exhibits should be permitted to go out with the jury.").

Accordingly, the trial court did not abuse its discretion in permitting the jury to view the articles during deliberation.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2016

PHILADELPHIA COURT OF COMMON PLEAS
CIVIL TRIAL DIVISION

JOIE DIGIOVANNI,

    v.

JOHN B. MURPHY

Sarmina, J.
February 25, 2016

November Term, 2013
No. 1291

Superior Court Docket No.
2902 EDA 2015

## OPINION

### PROCEDURAL HISTORY:

On August 12, 2015, following a jury trial before this Court, verdict was entered in favor of John B. Murphy (hereafter, the defendant), and against Joie DiGiovanni (hereafter, the plaintiff).[1] Timely post-trial motions were filed on August 21, 2015. On September 1, 2015, the plaintiff filed a notice of appeal.[2] Subsequently, on September 14, 2015, this Court denied the plaintiff's post-trial motions.

### FACTS:

On February 4, 2012, at around 6:00 P.M., the plaintiff was a passenger in her friend's vehicle, traveling east on Interstate 76 towards Center City Philadelphia. Notes of Testimony (N.T.) 8/10/15 at 46, 49-50. The plaintiff and her friend were facing each other talking, as they were stuck in traffic, when the defendant's vehicle collided with the vehicle in which the plaintiff was traveling. Id. at 50-51. The defendant was driving a sport utility vehicle (SUV), at approximately 45 miles per hour, when he was approaching the bend in Interstate 76 where Roosevelt Boulevard and City Line

---

[1] The plaintiff was represented by James Famiglio, Esquire, and the defendant was represented by Ronald Marrero, Esquire.

[2] This Court was instructed by the Superior Court that the plaintiff's premature appeal was to be considered as if it were timely filed after the denial of the plaintiff's post-trial motions.



Digiovanni Vs Murphy-OPFLD

Avenue meet. Id. at 125. The defendant did not immediately notice that the cars in front of him were stopped, and consequently he "rear-ended" the vehicle the plaintiff was traveling in, which was in front of him. Id. The car the plaintiff was traveling in hit the car in front of it, and that car hit the car in front of it as well. Id. at 51.

After the collision, the defendant exited his vehicle, walked over to the plaintiff, and asked if everyone was okay. Id. at 51. The plaintiff stated that she was not okay, and called her boyfriend to come to the scene of the accident. Id. at 52. The police also arrived at the scene. Id. at 51. The plaintiff's boyfriend then took her to Lankenau Hospital; she did not wait for an ambulance to arrive. Id. The defendant was able to drive his vehicle away from the accident scene. Id. at 132.

When the plaintiff arrived at the hospital, she was complaining of pain in her ankles, wrist, leg, hip, neck, back. Id. at 53. She also presented with a scrape on her chin, and a busted open lip. Id. The hospital staff performed x-rays and a CT scan, both of which came back negative. Id. at 54. The plaintiff was not admitted to the hospital, and was given Tylenol with codeine. Id. at 54-55. That same day, the plaintiff left the hospital and immediately traveled with her boyfriend to her parent's shore house in Margate, New Jersey. N.T. 8/10/15 at 54-55.

When the plaintiff returned from the shore, she began to swell and bruise. Id. at 55. Thus, the plaintiff sought treatment from Dr. Brent Weinerman, who treats people who have been in car accidents. Id. at 56. Because she did not like the area in which Dr. Weinerman's office was located, the plaintiff sought treatment from a different doctor about a week later – Dr. Harding, a chiropractor. Id. at 57. After being seen by Dr. Harding, the plaintiff then went to her family doctor, Dr. Alexander Ricciutti, who worked at Medical Rehabilitation Center of Philadelphia, with complaints of swollen wrists, arms, ankles, and a changing color sensation in her hands. Id. at 59. These symptoms never subsided following the motor vehicle accident the plaintiff was involved in, and they were not controlled by medication. Id. at 60.

2

Dr. Ricciutti referred the plaintiff to Dr. Yang, a physiatrist, who took an EMG and then referred the plaintiff to a rheumatologist. N.T. 8/10/15 at 71. The plaintiff went to Main Line Rheumatology, where she was diagnosed with fibromyalgia and rheumatoid arthritis. Id. at 72. The plaintiff was treated with the drug Humira, and a number of other drugs,[3] to which she was responsive. Id. at 73. The plaintiff testified that she injects herself in her stomach or her thigh with Humira every two weeks. Id.

After treating at Main Line Rheumatology for roughly one year, the plaintiff began seeing a different rheumatologist – Dr. Thomas Whalan – who was treating the plaintiff at the time of trial. Id. at 77-78. Dr. Whalan kept the plaintiff on the same drugs that she was previously prescribed, and the plaintiff testified that her symptoms are controlled, particularly by the Humira, which she described as a "miracle drug." Id. at 79-81.

LEGAL ANALYSIS:

The plaintiff raises two issues on appeal:

1. The verdict was against the weight of the evidence and against longstanding Pennsylvania law.

2. The Court erred in permitting the jury to receive in the jury room all expert medical reports and internet articles produced by defense counsel in the cross-examination of plaintiff's expert.

1) **The verdict was against the weight of the evidence and against longstanding Pennsylvania law.**

The plaintiff's first claim is that the verdict was against the weight of the evidence and against longstanding Pennsylvania law. The plaintiff claims that there was no dispute that the plaintiff sustained injuries to her wrists and ankles as a direct result of this motor vehicle accident,

---

[3] The plaintiff testified that while under the care of Main Line Rheumatology, she was prescribed Humira, Methatrexate, Cyclobenzaprine, as well as folic acid and a muscle relaxer. N.T. 8/10/15 at 77-79.

3

and thus the plaintiff was entitled to damages for those injuries.[4] Although the defendant's negligence was not disputed in this case, the plaintiff's injuries, as well as the causation of those injuries, was disputed, and the medical experts for both sides offered conflicting testimony as to causation. As it is within the sole province of the jury to make credibility determinations regarding conflicting testimony, the verdict was not against the weight of the evidence, and this claim fails.

Issues of credibility are for the jury to determine, and factual findings are rarely overturned where a jury has made credibility determinations regarding the testimony and evidence presented.

Armbruster v. Horowitz, 744 A.2d 285, 287 (Pa.Super. 1999), aff'd, 813 A.2d 698 (Pa. 2002).

> Credibility determinations are within the sole province of the jury. 'A jury is entitled to believe all, part or none of the evidence presented.... A jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve.' *Randt*, at 234, 671 A.2d at 233 (citation omitted).

Martin v. Evans, 711 A.2d 458, 463 (Pa. 1998).

The standard by which a trial court should review a weight of the evidence claim is as follows:

> This Court has repeatedly emphasized that it is not only a[ ] court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the [court] on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Mammoccio v. 1818 Market Partnership*, 734 A.2d 23, 28 (Pa.Super.1999) (citations omitted).

Armbruster, 744 A.2d at 287.

---

[1] In support of this proposition, the plaintiff cites to Casselli v. Powlen, in which the Superior Court found that the jury's award of zero damages was against the weight of the evidence presented at trial. 937 A.2d 1137, 1140 (Pa.Super. 2007). In Casselli, the plaintiff was injured when he stumbled and fell on a sidewalk outside of the defendant's home. Id. at 1138. It was undisputed at trial that the plaintiff fell and broke his foot, and there was no dispute that the medical expenses incurred by the plaintiff were reasonable. Id. The jury found that the defendant was 50% negligent, that the plaintiff was 50% negligent, and that each party's negligence was a substantial factor in causing the plaintiff's injuries. Id. at 1139. Nevertheless, the jury did not award damages to the plaintiff. Id. The Superior Court concluded that the jury's verdict of zero damages when there was no dispute as to the defendant's negligence and causation was against the weight of the evidence, and remanded the case for a new trial as to damages. Id. at 1141. Casselli, however, is not on point, as there was a dispute in the instant case as to the causation of the plaintiff's injuries, and the jury ultimately found that the plaintiff's injuries were not caused by the defendant's negligence.

4

In Martin, the plaintiff brought a personal injury lawsuit against a truck driver whose tractor-trailer truck backed into the plaintiff when pulling out of a parking spot at a rest stop. 711 A.2d at 460 (Pa. 1998). The jury returned a verdict in favor of the defendant, and the trial court granted a new trial based on a determination that the verdict was against the weight of the evidence. Id. at 461. Because there was conflicting testimony presented by the parties regarding the defendant's negligence, and the jury made a credibility determination regarding such testimony, our Supreme Court held that the trial court could not usurp the jury's factual determination that the defendant was not negligent. Id. at 459. Where there are conflicting facts in evidence, it is for the jury to make credibility determinations regarding the evidence, and the trial court may only reverse the jury's verdict where the verdict was "so contrary to the evidence so as to shock one's sense of justice." Id. at 463. As there was conflicting testimony regarding the defendant's negligence, our Supreme Court found that there was equally enough evidence to support a finding in favor of the defendant, and reinstated the jury's verdict. Id.

At trial, the videotaped depositions of the plaintiff's expert, Dr. Thomas Whalen, and the defendant's expert, Dr. Chris Derk, were played for the jury. Dr. Whalen, a board certified physician in rheumatology, began treating the plaintiff in July of 2013. Dr. Whalen Deposition, 4/23/15, at 10-11, 23. In addition to treating the plaintiff for two years, Dr. Whalen reviewed the following materials in order to prepare a report for the plaintiff: medical records and images from Lankenau Hospital, Dr. Weinerman, Dr. Harting, Main Line Rheumatology, and photographs of the plaintiff's ankles and feet. Id. at 25-26. Having reviewed these materials and treated the plaintiff, Dr. Whalen opined, to a reasonable degree of medical certainty, that as a result of the motor vehicle accident the plaintiff was involved in, the plaintiff suffered "cervical and lumbar strains and sprains, strains and sprain of her ankles, post-traumatic onset of rheumatoid arthritis, post-traumatic fibromyalgia syndrome, and possible RSD, which is reflex sympathetic dystrophy." Id. at 27-28. Dr.

5

Whalen testified that by post-traumatic, he meant that the rheumatoid arthritis and fibromyalgia occurred as a result of some sort of trauma, particularly the motor vehicle accident in which the plaintiff was involved. Id. at 36-37.

Although Dr. Whalen testified that the plaintiff's injuries were a direct result of the motor vehicle accident, Dr. Whalen admitted that the causes of rheumatoid arthritis are not well-known. Id. at 41. Later on in his deposition, Dr. Whalen clarified that what he really meant was that the rheumatoid arthritis was **triggered by** the motor vehicle accident, as no one really knows the "full cause" of rheumatoid arthritis. Id. at 62. Additionally, Dr. Whalen testified that, aside from his personal experiences with post-traumatic onset of rheumatoid arthritis, there are no "well-controlled double-blinded studies to prove it." Dr. Whalen Deposition, 4/23/15, at 42. Dr. Whalen also testified that the plaintiff could have had genetic susceptibility to rheumatoid arthritis. Id. at 92-93.

Dr. Derk, a board certified physician in rheumatology, examined the plaintiff and opined to a reasonable degree of medical certainty that the plaintiff's rheumatoid arthritis was **not caused by** the car accident that was the subject of this trial. Dr. Derk Deposition, 4/29/15, at 8, 24-25. In coming to his conclusion, Dr. Derk reviewed all of the documents provided to him: the plaintiff's deposition transcript, photos of the plaintiff, medical records and images from Weinerman Pain and Wellness, Lankenau Hospital, Main Line Rheumatology, Open MRI Center, Jefferson Imaging, Whalen Rheumatology Group, Mitchell Harding, D.C., and Penndel Rehab, as well as Dr. Whalen's report. Id. at 26-27. Dr. Derk examined the plaintiff himself on July 10, 2014. Id. at 27-28. Upon examining the plaintiff, Dr. Derk found no abnormalities:

> So when I examined the patient, this was July 10 of 2014, on that examination, that day, she presented with her mother. Her vitals were normal. She had slight tenderness over the trochanteric and anserine bursas. There was full range of motion of her joints, with no swelling of the joints. There was no limitation in motion of the joints. There was [sic] no joint deformities. Patient did not have rheumatoid nodules. There was no warmth or redness or fullness of any of her joints. She had slight paraspinal muscle pain in the cervical region. Her grip was very good in both hands. She had good range of motion of her ankles, knees, toes, hips, lower back, cervical spine, elbows, shoulders, hands, and wrists. I

6

examined her for carpal tunnel. She did not have that. I examined her for swollen lymph nodes or thyroid enlargement. She did not have that. I looked for oral ulcers and decreased moisture in her gums or her mouth and she did not have any issues with that. Her lung fields were clear. Her cardiovascular exam was normal. Because of the history of possible Raynaud's, I looked at the capillaries with a nailfold capillaroscopy and the nailfold capillaries were normal. . . . Her motor exam was good. The only abnormality that I could find was she had a venous malformation of her left shoulder that the mother told me was there since birth, which was a birthmark on the left shoulder. Otherwise, the neurological examination, as well as the motor examination, was completely normal.

Id. at 28-30.

Dr. Derk questioned the plaintiff's diagnosis of rheumatoid arthritis altogether, because the plaintiff's bone scan was normal, and blood work that was done before his examination of the plaintiff lacked inflammatory markers that are typically elevated in patients with rheumatoid arthritis. Id. at 39-40. Dr. Derk testified that there is no scientific data or research to suggest that rheumatoid arthritis can be caused by a car accident, and testified that Dr. Whalen's term, "post-traumatic rheumatoid arthritis," is not a term used or defined by the American College of Rheumatology. Id. at 30-31. Contrarily, Dr. Derk testified that, although there is no known cause for rheumatoid arthritis, there are certain risk factors: genetics, being female, being young, and smoking tobacco. Id. at 31, 33. Upon familiarizing himself with the plaintiff's history, Dr. Derk learned that the plaintiff possessed some of the risk factors – her grandmother had rheumatoid arthritis, and, although she had recently quit, the plaintiff had smoked for about five years. Dr. Derk Deposition, 4/29/15 at at 31. Dr. Derk also testified that there is no known cause for fibromyalgia. Id. at 37.

Having heard conflicting testimony from both experts regarding the causation of the plaintiff's injuries, the jury made a credibility determination, and found the testimony of the defense expert, Dr. Derk, to be more credible. As this determination was within the sole province of the jury, and there was evidence presented at trial to support this conclusion, the verdict was not against the weight of the evidence, and this claim fails.

7

**2) This Court erred in permitting the jury to receive in the jury room all expert medical reports and internet articles produced by the defense counsel in cross-examination of plaintiff's expert.**

The plaintiff's second claim is that this Court erred in permitting the jury to receive in the jury room all expert medical reports and internet articles produced by the defense counsel in cross-examination of the plaintiff's expert. As the trial court is permitted to make trial exhibits available to the jury during deliberations, this Court did not err in permitting the jury to view expert medical reports and internet articles[5] – that were all introduced into evidence at trial – during their deliberations. Thus, this claim fails.

During a jury trial, the court may "make exhibits available to the jury during its deliberations." Pa.R.C.P. 223.1(d)(3). The trial court has discretion to determine which exhibits should be permitted to be viewed by the jury during deliberations. Wagner by Wagner v. York Hospital, 608 A.2d 496, 503 (Pa.Super. 1992).

During deliberations, the jurors asked to see particular articles which were utilized by defense counsel during cross-examination of plaintiff's expert, Dr. Whalen. N.T. 8/12/15 at 53. The articles were attached to Dr. Whalen's deposition transcript, Exhibit P-13, and were admitted into evidence. Exhibits D-5, D-7, D-8. The jurors also requested to see the expert reports of Dr. Whalen and Dr. Derk, which were also moved into evidence, as attachments to the video deposition transcripts of Dr. Whalen and Dr. Derk. Exhibits P-13, D-4.[6] Upon consideration of plaintiff's counsel's objection, this Court sent only relevant portions of the articles, which were touched on in

---

[5] The plaintiff incorrectly states that this Court allowed the jury to view all internet articles produced by defense counsel on cross-examination of plaintiff's expert, Dr. Whalen, as this Court limited the articles to only those pages that were mentioned in the testimony. N.T. 8/12/15 at 68.

[6] Dr. Whalen's report was attached to Dr. Whalen's video deposition transcript as Exhibit Whalen-1. Dr. Derk's report was attached to Dr. Derk's video deposition transcript as Exhibit Derk-2, and his supplemental report was attached as Exhibit Derk-3.

8

the experts' testimony, to the jury.[7] N.T. 8/12/15 at 68. This Court allowed the expert reports of Dr. Derk and Dr. Whalen to be sent to the jury, as they were also admitted into evidence. Id.

As this Court acted within its discretion in allowing the jurors to view portions of the articles and the experts' reports – which were all properly admitted into evidence at trial – during deliberations, this claim fails.

For the foregoing reasons, the verdict entered in favor of the defendant should be affirmed.

BY THE COURT:

M. TERESA SARMINA,                    J.

---

[7] Particularly, pages 1, 3, 4, 9, and 10 from the NIH article, entitled "Rheumatoid Arthritis," were sent to the jury. N.T. 8/12/15 at 74; Exhibit D-5. Pages 1, 2, and 7 from the Mayo Clinic article, entitled "Diseases and Conditions: Rheumatoid Arthritis," were sent to the jury. Id.; Exhibit D-7. Finally, page 1 from the Cleveland Clinic article, entitled "Rheumatoid Arthritis," was sent to the jury. Id.; Exhibit D-8.

9